KASSAM CORP., Plaintiff, *v.* JAMES F. WALSH, Defendant.

Supreme Court, Special Term, Suffolk County, January 6, 1954.

678

*Saul Wolf* for plaintiff.

*Gerald T. Ryan* for defendant.

COLDEN, J. This is a suit for the specific performance of a contract for the sale of real estate located in the town of Babylon, Suffolk County, New York.

On October 21, 1952, the written contract was entered into between the defendant James F. Walsh, as vendor, and one Thomas Blen, the plaintiff's assignor, as vendee. The contract had been prepared in the first instance by the seller's attorney Stephen T. Voit. It described the property in four parcels which the seller represented to be contiguous.

Parcel 4 which was stated to contain approximately five acres has particular significance. The agreement stated that this

property was held by a quitclaim deed from the County Treasurer and "Will be transferred by the Seller to the Buyer by a Quitclaim Deed, unless prior to that time the Seller is able to perfect title." The quoted words were stricken out prior to execution and the following sentence was inserted in handwriting and initialed by the attorneys representing the respective parties: "If the seller is unable to deliver marketable title to Parcel 4 consisting of 5 acres, it is understood and agreed that the purchaser shall take title to the balance of 45 acres."

It was also provided that the purchaser at his own expense and prior to the closing of title shall have the property surveyed and that the descriptions to be used in the deed be in the form approved by the title company or the surveyor. The following provision was also inserted in ink and duly initialed: "The purchaser has the right to assign this contract and upon such assignment the assignor shall be released completely; a copy of such assignment shall be served upon the seller's attorney at least five days before closing title."

The purchase price was fixed at $1,500 per acre, the total price to be computed when the survey had been made. Seventy-one per cent of the purchase price was to be in the form of a purchase-money mortgage to be executed by the purchaser " or assigns ", the terms and conditions of which were fully stated in the contract. Seven thousand, five hundred dollars had been paid upon the signing of contract and the balance was payable by cash or certified check upon the delivery of the deed. The closing of title was set for February 23, 1953, but as that proved to be a legal holiday, adjournment by consent was taken to March 2, 1953.

Under date of February 11, 1953, Thomas Blen, the vendee, executed a written assignment of the contract to Kassam Corp., the plaintiff in this action. A copy thereof was mailed to the vendor's attorney on February 21, 1953. Prior thereto, a title search and title insurance had been ordered on behalf of the ultimate purchaser from the Home Title Guaranty Company and the necessary survey had been obtained from Bernard J. Bolender, land surveyor, and by him certified to the Home Title Guaranty Company. This survey showed a total acreage not of 50 acres but of 43.394 acres, while the acreage of parcel 4 was not 5 acres but 4.314. The title report of the Home Title Guaranty Company raised certain exceptions with respect to parcel 4, more specifically the following: " M. The title of certified owner, as to parcel 4, is a tax title only, based on the 1946 tax sale for unpaid taxes of 1945. At the time of the sale, this parcel was

assessed to Randolph Soper. We are unable to find anything of record showing source of title of said Randolph Soper. The underlying fee title was owned at a very early date by one Henry O. Snedecor who conveyed the westerly portion thereof to Charles Snedecor by deed dated February 4, 1857 and recorded in Liber 108 cp 214, and who by deed dated November 9, 1857 and recorded in Liber 108 cp 215 conveyed the easterly portion thereof to Fanny Smith. We are unable to find anything of record showing devolution of title from said Charles Snedecor or from said Fanny Smith. N. Policy will except any interest Frank E. Blachley may have or claim in parcel 4 by virtue of 1938 tax sale for unpaid taxes of 1937.''

These, of course, are not binding upon the court. The agreement required a marketable, not an insurable title. In addition to this, the witness Gordon Hoops, vice-president of Home Title Guaranty Company, testified that he had examined the records of the Suffolk County Treasurer's office in connection with the 1946 tax sale and found no proofs there on file of any posting or publication by the tax receiver of the Town of Babylon with respect to the underlying tax upon which said sale had been based.

On February 18, 1953, Mr. Voit, representing the seller, wrote to Samuel Golding, Esq., the attorney for the purchaser and the president of the plaintiff corporation, regarding certain matters incidental to the closing of title. The next to closing paragraph of said letter reads as follows: '' As you know, Mr. Walsh has made no effort to clear title to the tax property in Parcel 4, so that you might let me know whether or not you intend to take title to same on the day of closing.''

On February 21st Mr. Golding wrote to Mr. Voit in part as follows: '' At the time of the closing I shall advise you whether my client will take title to parcel 3.''

Parenthetically it should be stated that parcel 4 of the contract had become parcel 3 of the title company's descriptions.

Thereafter, Mr. Golding notified Mr. Voit by telephone that the purchase would include only the balance of the property. This was established by the testimony of both attorneys.

On March 2, 1953, the interested parties assembled at Mr. Voit's office for the purpose of closing title. Mr. Wissbach, the representative of the title company, first appeared and together with Mr. Voit checked the deeds, the bond, and the purchase-money mortgage which Mr. Voit had previously prepared. Mr. Golding then arrived and he and Mr. Voit thereupon made the relevant computations. A tentative closing statement was pre-

pared on the basis of the parcel of 4.314 acres being eliminated from the calculations. A balance of $11,749.78 was found thereby to be due the vendor. Mr. Golding had in his possession two certified checks each in the sum of $5,650, payable to the order of James F. Walsh. In addition thereto, he testified and the court finds the fact to be that he had sufficient cash in his possession to make up the necessary balance. It only remained to insert the necessary amounts in the purchase-money mortgage and to execute the various instruments. Thereupon, Mr. Walsh entered with his secretary, Miss Villano. Mr. Walsh asked Mr. Golding how he proposed to make payment. Mr. Golding referred to the two certified checks and Mr. Walsh then asked to look at them. He took the two checks, called his secretary and dictated some sort of a memorandum to her, apparently a summary of their contents. Thereupon, he returned the two certified checks, stated there would be no closing and still accompanied by his secretary, left Mr. Voit's office.

The court does not credit the defendant's testimony that at the closing he demanded that the plaintiff include parcel 4 in the purchase and only declined to consummate the sale upon its refusal so to do. The court believes that the parties and their attorneys had come to an understanding to close the deal on the basis of the first three parcels; that the defendant for some reason or other had experienced a change of heart concerning the expediency of the deal and had determined to withdraw entirely from the transaction. The very fact that the defendant in going to the office of his own attorney was nevertheless accompanied by a personal secretary is indicative of such purpose. In the opinion of this court, the defendant had decided that there would be no closing and intended to prepare memoranda for use in the prospective litigation he anticipated his conduct would give rise to. There could be no other reason for taking his private stenographer to his counselor's office.

This opinion could well be brought to a close at this point and the court could rest its decision on the practical construction given by the parties to their own agreement. Their interpretation was that some affirmative act on the part of the defendant was required to clear title to the tax parcel. This could take the form of an action to quiet title, a title registration proceeding, the obtaining of quitclaim deeds or some other form of conceivable activity. Failing such perfecting of title by the vendor, the option lay with the vendee to include parcel 4 or not, the latter having the right as well as the obligation to purchase the balance.

However, inasmuch as the marketability of the title was fully litigated, as well as briefed, the other issues will be passed upon.

Tax sales have always presented difficult problems. Judges and lawyers invariably look askance at titles founded thereon. Indeed Weed, one of the leading authorities on the law of real property, categorically impugns all such titles stating at page 1643 in volume 3 of the third edition: "PRACTICALLY ALL TAX TITLES ARE UNMARKETABLE, *because all the steps leading up to the tax and to the sale, are jurisdictional; and either, these steps are not properly taken by the officials, or the records thereof are not preserved. Thus, owing to gross official ignorance and carelessness, the most that an outside purchaser can hope to accomplish at a tax sale, is to cloud the title. Attempts have been made to cure this situation by legislative enactments making the tax deeds and leases conclusive evidence of the regularity of all prior proceedings, but the Court of Appeals has declared that such legislation cannot remedy jurisdictional defects in taxation.*"

This court cannot concur in any such sweeping characterization. Upon certain conditions and under certain circumstances titles resting on sovereign taxing power can become fully effective and valid. Scrupulous compliance with all statutory requirements is essential. (*Mabie* v. *Fuller,* 255 N. Y. 194; *Rosenblum* v. *Eisenberg,* 123 App. Div. 896; *Eisenhut* v. *De Vries,* 150 Misc. 804, affd. 243 App. Div. 539.)

However, a title which would ultimately be held to be a good title is not necessarily a marketable title to be forcibly imposed upon a purchaser. The test of marketability has been many times judicially defined. Is there reasonable doubt of the validity of the title? Will the purchaser probably be subjected to litigation to defend or establish his title? As this court itself stated in *Agliata* v. *D'Agostino* (N. Y. L. J., May 6, 1953, p. 1524, col. 1): "A title is 'unmarketable' when for the purchaser to accept the title proffered would lay him open to a fair probability of vexatious litigations with the possibility of serious loss (Thompson on Real Property, Permanent Edition, Vol. 8, sec. 4585, p. 539)."

Nor, of course, can the validity of a disputed title be declared in the very decree which directs specific performance, for no one other than the vendor and the vendee, the particular parties to the suit, would be bound thereby or have their rights thereby adjudicated. "A court may decree specific performance of the contract of purchase only if the deed which the purchaser

would be compelled to accept transfers a title which cannot thereafter be challenged on substantial grounds. (*Abbott* v. *James,* 111 N. Y. 673.) At the time when the deed is tendered questions of law which have not yet been judicially determined by the courts may cast a shadow of doubt upon the title; the shadow is removed when a court which can authoritatively decide those questions of law has spoken. A decree of specific performance does not compel a purchaser to accept a doubtful title where the decree itself constitutes an authoritative determination of the questions of law which until that time were not free from doubt. (See Pomeroy on Specific Performance, 3d ed., 1926, § 202 *et seq.,* and cases there cited. *Forster* v. *Scott,* 136 N. Y. 577.) In this case, however, the courts of this State cannot authoritatively determine the questions of law which create serious doubt as to the validity of the statute by virtue of which the seller has acquired title and no decree of specific performance can give to the buyer assurance that the title transferred to him will not be successfully challenged thereafter. The question of the validity of the statute has been challenged on substantial grounds. This court can authoritatively determine whether or not the statute violates the provisions of the Constitution of the State of New York; only the Supreme Court of the United States can ultimately determine whether the statute violates the provisions of the Constitution of the United States. Even though this court were to sustain the validity of the statute, the Supreme Court of the United States might still reach a different conclusion. A subsequent purchaser could at any time reject title on that ground and litigate that question in a different forum. A title which can be challenged in that manner is not marketable and decree of specific performance may not be rendered under such circumstances.'' (*Lynbrook Gardens* v. *Ullmann,* 291 N. Y. 472, 477. See, also, *Gould* v. *Wilson,* 115 N. Y. S. 2d 177; *Thomas* v. *Loomis,* 273 App. Div. 680, and *Sloan* v. *Rice,* 197 Misc. 855.)

Tested by these standards, did the plaintiff have the right to reject this title as unmarketable? The court believes that the answer must be in the affirmative.

Section 22 of the Suffolk County Tax Act (L. 1920, ch. 311, as amd.) requires the tax receiver within one week after receipt of the tax and assessment roll to publish notice thereof in newspapers designated by the town board and to post such notice conspicuously in each election district.

Section 73 directs the County Treasurer to procure, preserve and register in his office affidavits of the publication of all notices required to be published *by this title* and such affidavits are made presumptive proof of such publication. The defendant contended in his brief that the italicized phrase referred only to the article in which section 73 appears. The court overrules this assertion and determines that "this title" means the Suffolk County Tax Act.

Section 53 provides that a tax deed executed by the County Treasurer is presumptive evidence that the sale was regular and also presumptive evidence that all proceedings prior to sale, including the assessment of the land sold and all notices required by law to be given with respect to the redemption thereof, were regular and according to law. After six years from the date of record of any such conveyance in the Suffolk County Clerk's office, such presumption shall be conclusive.

During the trial of this action, the defendant's attorney procured the filing of affidavits of publication of the tax notice in question in the five newspapers published in the town of Babylon. But these affidavits were all executed while the trial was in progress during the month of June, 1953. Concededly, they were not in existence at the time of the search made in the treasurer's office by the purchaser's title company or on the date of closing, the 2d day of March, 1953.

Moreover, even if this court of equity were to give weight and credence to evidence newly discovered or to use a more apt description newly created subsequent to the law day, these affidavits themselves presented a probable further defect in the tax proceedings.

The published notice stated that the tax receiver had received the tax roll and warrant and would be in attendance to receive taxes commencing December 10, 1945. The affidavits certified publication in the five papers on either December 27th or December 28, 1945; hence publication was clearly not made within the one week required by section 22.

The defendant's title was based upon a quitclaim deed from Suffolk County. This in turn had been preceded by the tax deed from the County Treasurer to Suffolk County dated December 12, 1949, and recorded December 21, 1949, in Liber 3029 of conveyances, page 203. Had six years elapsed from the recording of the tax deed and had the Statute of Limitations placed its protecting arm about this title, a different result would no doubt have been arrived at.

The 1953 decision of the Appellate Division, Second Department, in the case of *Cameron Estates* v. *Deering* (281 App. Div. 985, 986) is highly significant. Therein the court stated as follows: "The proceedings resulting in the tax deeds to defendant County of Suffolk were jurisdictionally defective. (*Seafire, Inc.,* v. *Ackerson,* 193 Misc. 965, affd. 275 App. Div. 717, affd. 302 N. Y. 668; *Bryan* v. *McGurk,* 200 N. Y. 332, 336.) However, section 53 of the Suffolk County Tax Act (L. 1929, ch. 152, as amd. by L. 1941, ch. 140) is a valid Statute of Limitations and bars the assertion by plaintiff of jurisdictional defects leading to the tax sales, as to the two deeds recorded six years or more prior to the commencement of the action in 1944. (*Matter of Kantor [Hutner],* 280 App. Div. 605.) " (See, also, *Dunkum* v. *Maceck Bldg. Corp.,* 256 N. Y. 275, 285.)

The six-year term referred to in the foregoing excerpt was reduced by later legislation to three years. This does not affect the litigation here under consideration.

Section 53 barred the assertion of defects leading to the tax sale after the expiration of six years from the recording of the tax deed. Apparently the title can be assailed unrestrictedly, for so-called jurisdictional defects within that period. See the leading case of *Seafire, Inc.,* v. *Ackerson,* and also *Matter of Kantor (Hutner),* the citations of which appear in the last quotation.

On the other hand a shorter Statute of Limitations would seem to be the import of section 63, which, as in effect at the time of the tax in question, read as follows: "*Presumption of validity of tax.* It shall be presumed that every tax levied and assessment made is valid and regular, and that all the steps and proceedings required by law were taken and had, until the contrary shall be made to appear. Any action or proceedings commenced by any person or persons to test the validity or regularity of any tax levied or assessment made shall be commenced within two years from the first publication of the notice that town receiver of taxes has received the warrant from the board of supervisors and that such tax is ready for collection, as provided in section twenty-two of this act. The invalidity or irregularity of any tax or assessment shall not be available as a defense to any action or proceeding commenced after the expiration of two years from the delivery of such warrant as aforesaid, or for the enforcement of any right or title, by virtue of any sale thereunder, unless such action or proceeding to test the validity or regularity of such tax or assessment shall have been commenced within the time

hereinbefore limited for commencing the same, and shall be still pending, or such tax or assessment shall have been adjudged to be irregular and invalid." (L. 1920, ch. 311, as added by L. 1929, ch. 152.)

This was applied in *Smith* v. *Albertson* (201 Misc. 940, affd. 281 App. Div. 990).

The inconsistency between the periods of limitations as set forth in section 53 and in section 63 of the Suffolk County Tax Act, and the apparent conflict between the decision of the Appellate Division, Second Department, in *Smith* v. *Albertson* (*supra*) with its holding in *Cameron Estates* v. *Deering* (*supra*) and with the affirmance of the Court of Appeals in *Seafire, Inc.*, v. *Ackerson* (*supra*), would tax the legal acumen of the wisest of judges. This court will not attempt to resolve them. It will not hold that the plaintiff purchaser was compelled so to do. Suffice it to say that sufficient doubt existed as to the validity of the tax title to warrant the plaintiff rejecting the same for lack of marketability. It must be kept in mind at all times that this is not a direct action whose purpose is to perfect or quiet title. It is a suit for specific performance in which marketability is the principal question.

The defendant has further argued that specific performance cannot here be decreed because the plaintiff is an assignor of an original contracting party and, accordingly, a lack of mutuality prevails. The obvious answer to this is that the defendant specifically contracted to the purchaser the right to assign and be released, and exacted therefor no assumption of the obligations of the contract on the part of the assignee. In addition, the law as now constituted does not recognize the former doctrine of so-called mutuality. " We hold, then, that specific performance was available to assignee as to assignor. * * * If there ever was a rule that mutuality of remedy existing, not merely at the time of the decree, but at the time of the formation of the contract, is a condition of equitable relief, it has been so qualified by exceptions that, viewed as a precept of general validity, it has ceased to be a rule to-day ". (*Epstein* v. *Gluckin,* 233 N. Y. 490, 493.) See, also, *Rizzo* v. *Stamp Realty Corp.* (196 Misc. 615, affd. 276 App. Div. 973) and *Clark Co.* v. *New York, New Haven & H. R. R. Co.* (279 App. Div. 39).

The equities are clearly with the plaintiff and, accordingly, there will be judgment in its favor as prayed for in the complaint, with costs. The foregoing constitutes the decision of the court.

Settle judgment on notice.